UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALAN C. LOLLIS, | ) | 5:15CV00703 |
| | ) | |
| Petitioner | ) | |
| | ) | JUDGE JAMES S. GWIN |
| v. | ) | (Mag. Judge Kenneth S. McHargh) |
| | ) | |
| WARDEN, OHIO STATE | ) | |
| PENITENTIARY, | ) | |
| | ) | |
| Respondent | ) | REPORT AND |
| | ) | <u>RECOMMENDATION</u> |


McHARGH, MAG. JUDGE

This 28 U.S.C. § 2254 petition is before the magistrate judge pursuant to

Local Rule 72.2(b)(2).  Before the Court is the petition of Alan Lollis ("Lollis") for a

writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  The petitioner is in the

custody of the Ohio Department of Rehabilitation and Correction pursuant to

journal entry of sentence in the case of *State of Ohio v. Lollis*, Case No. 2011-11-

3220 (B) (Summit County July 31, 2012).  (Doc. 5-1, Ex. 10.)  For the following

reasons, the magistrate judge recommends that the petition be DENIED.

Lollis has filed a pro se petition for a writ of habeas corpus, arising out of his

2012 convictions for aggravated murder, murder, and aggravated robbery in the

1

Summit County (Ohio) Court of Common Pleas.  In his petition, Lollis raises the

following grounds for relief:

1.    The convictions on all charges obtained without sufficient
      competent and credible evidence to prove each element of each
      charge violates Petitioner's right to due process of law.

2.    Erroneous jury instructions on uncharged crimes served to alter the
      burden of proof violating Petitioner's right to due process of law and a
      fair trial by an impartial jury.

(Doc. 1.)

The respondent ("Respondent") has filed a return of writ.  (Doc. 5.)  Lollis has

filed a traverse, to which Respondent replied.  (Docs. 7, 8.)

## I.  INTRODUCTION

The Ohio Court of Appeals, in reviewing Lollis' convictions on direct appeal,

provided the following factual account of Lollis' crimes:

{¶ 2} On July 19, 2011, Salim Suleiman was fatally shot outside of
Kelley's Carryout in Akron, Ohio. The Summit County Grand Jury
indicted Mr. Lollis and another man, Gevonte Hunter, on the . . .
charges stemming from these incidents . . . .  [T]he case proceeded to
jury trial. Although the indictment charged both Mr. Lollis and Mr.
Hunter with the principal offenses, at trial the State proceeded on a
theory that Mr. Lollis was complicit in the crimes. The jury found Mr.
Lollis guilty on all charges. . . .

{¶ 10} As part of the State's case-in-chief, it produced the testimony of
Lashawna Boswell, Mr. Suleiman's brother Fadi Suleiman, law
enforcement officers from the City of Akron Police Department,
employees of cellular telephone service providers, Tasha Thomas, and
employees of the Summit County Jail.

2

{¶ 11} Lashawna Boswell testified that she is Mr. Hunter's aunt. Ms. Boswell's cousin lives on Fernwood Drive close to Kelley's Carryout, and there is cut through a yard that is adjacent to her cousin's house, on which people can walk to get to Kelley's. From her cousin's living room, she can see the cut through a picture window. On July 19, 2011, Ms. Boswell was drinking alcohol at her cousin's house. She thought that she saw Mr. Hunter's paternal grandmother drop Mr. Hunter off close by, and then believed that she saw Mr. Hunter walk by the Fernwood residence on the cut. About a minute later, her cousin informed her that she heard gunshots. They went outside and saw someone lying on the ground outside of Kelley's, while two employees of Kelley's stood nearby the body. After asking the Kelley's employees if they needed assistance, Ms. Boswell began performing CPR on the man, and continued to do so until police officers arrived.

{¶ 12} Responding officers testified that when they arrived at Kelley's, the victim, later identified as Mr. Suleiman, was lying in the parking lot, and he appeared to have an entry wound to his chest. Ms. Boswell was trying to assist him, and an officer took over administering CPR. The officers observed that Mr. Suleiman was lying in the parking lot near a green car, on which both front doors were open. The officers attempted to retrieve security camera footage from employees of Kelley's. However, the equipment was not working, and no footage was available. In the parking lot, the officers observed two shell casings, a cell phone, blood, and a spent bullet.

{¶ 13} Detective Mildred Morris testified that that she and her partner went to Kelley's to photograph and videotape the scene. The photographs and the video recording were admitted into evidence. Inside of the car, the detective photographed numerous items, including a Nokia cell phone. The cell phone was located next to the crease in the seat and was partially covered by a $20 bill.

{¶ 14} Mr. Suleiman's brother testified that his brother had been driving his green Acura, and identified the Acura as the car officers photographed in the parking lot at Kelley's. He further testified that his brother had two cell phones, one of which was the phone discovered in the parking lot.

{¶ 15} Detective James Pasheilich testified that he was the lead detective assigned to this case. Detective Pasheilich arranged for Detective Guy Sheffield of the police department's computer forensics

unit to examine the cell phones found at the scene. In regard to Mr. Suleiman's telephone, Detective Sheffield copied screen shots of certain text messages sent and received by Mr. Suleiman from the day of the shooting. These messages were between Mr. Suleiman and an individual utilizing a 480 area code, and listed in Mr. Suleiman's contacts as "Young Homie[.]" First, at 1:24 p.m ., Young Homie sent a text to Mr. Suleiman stating: "My bad was stuk in traffic u n da hood [.]" Mr. Suleiman responded, "Nah will b later[.]" Later that afternoon, the two exchanged a series of texts between 4:59 and 5:07. First, Mr. Suleiman sent a text to Young Homie stating, "About to head back up my way..let me no I got a lil loud left[.]" Detective Pasheilich testified that "loud" is slang for marijuana. Young Homie then asks, "u at kellys," to which Mr. Suleiman replied, "I'm at the dairy mart were u at[.]" Young Homie then stated "on madison on my way to kellys[.]" Mr. Suleiman replied "Me to[.]" Young Homie then stated, "Meet me at kellys[.]" Mr. Suleiman replied "Yup I'm here [.]" Young Homie then sent the text "B there n 2mins[.]" Each of the text messages from Young Homie ended with the signature "$tackOr$tarve."

{¶ 16} Detective Sheffield testified that Detective Pasheilich also requested that he examine the Nokia cell phone found in Mr. Suleiman's car. An AT & T representative also testified in regard to the cell phone subscriber information. From the numbers and records provided, the detectives and the AT & T representative's testimony established that the cell phone recovered from the car was registered to Mr. Hunter's mother, Roxanne Ellerbe. Detective Sheffield further testified as to several text messages sent between the Nokia phone and a contact in the phone named "Bezz," whose phone number is listed as the same 480 number identified as that belonging to "Young Homie" on Mr. Suleiman's telephone. At 5:09, the Nokia phone received a text from Bezz which stated, "Wat up he on his way to kelly tare em up just hit me up wen u done[.]" A few seconds later, the Nokia phone user sent a text to Bezz asking, "Wat kinda car [?]" Bezz replied at 5:11 stating, "Lil kia mazda look like its green and were sun glases and long hair arab lite skin[.]" At 5:40 Bezz sent another message reading only "man u good" to the Nokia phone. At 5:47, the Nokia phone received two texts from Bezz stating, "Bro get to da east cut me n cal me asap," and "Im on da east side on fulton[.]" All of text messages from "Bezz" end with signature "$tackOr$tarve."

{¶ 17} Chris Sproul testified that he verifies records for law enforcement through his employment at Verizon Wireless. He received a subpoena relative to the records for the 480 number associated with

4

Young Homie and Bezz as set forth above. He explained that Verizon does not maintain subscriber information for this number. However, Verizon did have the incoming and outgoing telephone call records from this phone together with text records. Mr. Sproul testified that the area code 480 is an area code for Gilbert, Arizona. However, the calls on the log were made from and received in Akron, Ohio.

{¶ 18} Tasha Thomas testified that a friend of hers named Santashae "Sandy" Bradley, and her boyfriend, Mr. Lollis, were staying at her house over the summer of 2011. While he was staying with her, Mr. Lollis told Ms. Thomas about a "robbery gone bad" at Kelley's. Mr. Lollis informed her that he had set up a robbery at Kelley's targeting "[s]ome Arab." Mr. Lollis explained to her that he was "texting some dude telling him what the dude in the car had on, what kind of car he was driving." Ms. Thomas testified that she knew Mr. Lollis by his nickname, "Bezel," and she had shown a detective the number for Alan Lollis that she had saved in her cell phone. Detective Pasheilich testified that this number matched the number of "Young Homie" and "Bezz[.]" Ms. Thomas further testified that when she received texts from Mr. Lollis, the signature line of the text would read "[s]tack and starve[.]" Ms. Thomas also provided the officers with Mr. Lollis' driver's license, which she stated he had left at her house. Ms. Thomas verified that she has a visible scar on her face.

{¶ 19} Nancy Mundy testified that she works for the Summit County Sheriff's Office recording jail inmate telephone conversations. Ms. Mundy authenticated telephone recordings, which were admitted into evidence. In one call, Mr. Lollis called a woman and told her that she needed to see "what is up with old girl" who said he stole a television and who "told the dicks I was that name [ .]" Later on this call, Mr. Lollis repeats this sentiment and then tells the woman on the other end of the line that she needed to get as many people as possible to come to court to testify that he was Alan Lollis, not "Bezel." On another call, Mr. Lollis explains that no one knows him as Bezel, but the "bitch with a scar on her face who stay down the way," had told police that "Bezel" broke in and stole her television, and she had Mr. Lollis' identification from when he used to "mess around" with Santashae. However, in another call, a woman who answers the telephone refers to Mr. Lollis as "Bezz," and Mr. Lollis does not comment on this reference or otherwise correct the woman as to his name. Later in the call, Mr. Lollis refers to himself as "Bezel," when relaying to the woman something he maintained her mother had said to him. On another call, a woman greets Mr. Lollis' call by saying "Hey,

Bezel how you doing?" Again, Mr. Lollis does not comment on or correct the woman as to his name. In another call, Mr. Lollis explains to a man that he will call him off someone else's "line" later and tell him about what was going on. Later, a call is made to the same number from a different inmate's identification number. The caller says, "You know the bitch with the scar on her face on the Southside? * * * I need someone to pull her tight on that—that's on my paperwork to see what's going on with that bitch." Then, again a call is made to the same outside number from a different inmate identification number, in which the inmate asks "remember when I told you about that broad," and the inmate then asks if anyone ever got in touch with her. He also remarks that things were "looking real good" as long as "that broad's out of the way."

{¶ 20} Kelly Pongracz testified that she works at the Summit County Jail, and, during a period of time while she was supervising the inmate services in the commissary and mail, she received orders to copy the mail of Mr. Hunter and Mr. Lollis. One of these letters that was submitted into evidence was addressed from Mr. Lollis to Ms. Bradley, and reads in part:

> Wen we go to court make sure that you rember wen they ask you do u no a dud name bez or mess with him and u said yeah but don't no more that's kool but wen they ask who do you mess with now his name is Alan and we start talkn around February and make sure you tell yo ma to write me and let me no wat all she told the dicks so I can no wat to say and wat not to. I need to no wat sunny told them to and big will. Don't want to get up there and we all look n dum. Tasha lite weight f* * *ed me over wit my ID being at her house they got that to go so make sure she aint coming to court. And ask her wat she told them.

(Sic.)

*State v. Lollis*, No. 26607, 2014-Ohio-684, 2014 WL 787224, at **1-6 (Ohio Ct. App. Feb. 26, 2014).  (Doc. 5-1, Ex. 15 at 113-21.)

## II.  PROCEDURAL BACKGROUND

### A.  Indictment and Conviction

On December 5, 2011, the Summit County Grand Jury issued an indictment charging Lollis with one count of aggravated murder (Count 1) and two counts of aggravated robbery (Counts 2 and 3).  (Doc. 5-1, Ex. 1.)  The indictment later was supplemented to add a charge of murder (Count 4).  (Doc. 5-1, Ex. 2.)  All charges included firearm specifications.  (Doc. 5-1, Exs. 1, 2.)  On February 16, 2012, Lollis entered a plea of not guilty.  (Doc. 5-1, Ex. 4.)

Prior to trial, Lollis filed a motion for a separate trial from his co-defendant Gevonte Hunter, which the court denied.  (Doc. 5-1, Exs, 5, 6.)  A jury trial commenced on June 4, 2012.  (Doc. 5-1, Ex. 9.)  Lollis moved for a mistrial, asserting that the State knowingly presented false testimony from witness Tasha Thomas, and that Detective Pasheilich attempted to introduce evidence alluding to Lollis' past criminal activities.  The court denied the motions. (Doc. 5-9 at 17-27, 29-33.)  Lollis also twice moved the court for acquittal, which the court also overruled. (*Id.* at 37-46, 107.)

On June 14, 2012, the jury found Lollis guilty of all charges.  (*See* Doc. 5-1, Ex. 8.)  On July 19, 2012, the trial court, merging all counts and firearm specifications, sentenced Lollis to prison terms of 30 years to life, with parole eligibility after 30 years, for aggravated murder, and three years for the firearm

specifications, for an aggregate sentence of 33 years to life in prison.  The court also sentenced him to five years of post-release control.  (Doc. 5-1, Ex. 10.)[1]

## B.    Direct Appeal

On August 29, 2012, Lollis, through counsel, filed a timely notice of appeal with the Ninth District Court of Appeals.  (Doc. 5-1, Ex. 12.)  In his appellate brief, he raised the following assignments of error:

1.    Appellant's convictions for aggravated murder, murder, and aggravated robbery with gun specifications thereto were void as a matter of law.

2.    Appellant's convictions for aggravated murder, murder, and aggravated robbery with gun specifications thereto were based upon insufficient evidence as a matter of law.

3.    Appellant's convictions for aggravated murder, murder, and aggravated robbery with gun specifications thereto were against the manifest weight of the evidence.

4.    The trial court erred as a matter of law in imposing a mandatory period of post-release control for aggravated murder, a special felony.

(Doc. 5-1, Ex.13.)

On February 26, 2014, the appellate court overruled Lollis' first through third assignments of error and sustained his fourth assignment of error.  The court remanded the case to the trial court for correction of the sentencing entry as it related to the imposition of post-release control.  *Lollis*, 2014 WL 787224, at *11.

---

[1]  On August 7, 2012, the trial court issued a nunc pro tunc order correcting an error in the sentencing journal entry of July 31, 2012, so that Lollis' name would appear in paragraph 4, instead of his co-defendant's name, Gevonte Hunter.  (Doc. 5-1, Ex. 11.)

Lollis did not timely appeal the appellate court's decision to the Ohio Supreme Court.

## D.     Delayed Appeal

On December 17, 2014, Lollis filed a pro se notice of appeal and motion for leave to file a delayed appeal in the Ohio Supreme Court.  (Doc. 5-1, Exs. 16, 17.)  In his motion for leave to file a delayed appeal, Lollis explained that his appeal was untimely because his appellate counsel never advised him that the appeal had been decided and he had limited access to legal services in prison.  (Doc. 5-1, Ex. 17 at 134.)  The court summarily denied the motion on January 28, 2015.  (Doc. 5-1, Ex. 18.)

## E.     Federal Habeas Corpus Petition

Lollis filed a pro se petition for writ of habeas corpus in this Court on April 9, 2015.  (Doc. 1.)  He asserts the following grounds for relief:

1.     The convictions on all charges obtained without sufficient competent and credible evidence to prove each element of each charge violates Petitioner's right to due process of law.

Supporting Facts:  The evidence adduced at trial fails to establish each essential element of each charged offense, even for a complicity conviction. There is no competent or credible evidence linking Petitioner to the offenses whatsoever.

2.     Erroneous jury instructions on uncharged crimes served to alter the burden of proof violating Petitioner's right to due process of law and a fair trial by an impartial jury.

Supporting facts: Petitioner was charged with "complicity" as an accessory to the crimes, because there is non [sic] evidence

9

> directly linking him to the offenses. The trial court, however, at
> the behest of the prosecutor, charged the jury to convict him of
> "conspiracy" despite not being charged with conspiracy. In effect,
> the erroneous instruction caused Petitioner to be convicted
> based upon crimes not charged, constituting plain error.

(*Id.* at 4, 6.)  Respondent filed a return of writ on June 11, 2015.  (Doc. 5.)  Lollis

filed a traverse on August 26, 2015.  (Doc. 10.)  Respondent then replied to the

traverse on September 8, 2015.  (Doc. 8.)

## III.  HABEAS CORPUS REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), 28 U.S.C. § 2254, which provides the standard of review that

federal courts must apply when considering applications for a writ of habeas corpus.

Under the AEDPA, federal courts have limited power to issue a writ of habeas

corpus with respect to any claim which was adjudicated on the merits by a state

court.  The Supreme Court, in *Williams v. Taylor*, provided the following guidance:

> Under § 2254(d)(1), the writ may issue only if one of the following two
> conditions is satisfied -- the state-court adjudication resulted in a
> decision that (1) "was contrary to ... clearly established Federal law, as
> determined by the Supreme Court of the United States," or (2)
> "involved an unreasonable application of ... clearly established Federal
> law, as determined by the Supreme Court of the United States."
> Under the "contrary to" clause, a federal habeas court may grant the
> writ if the state court arrives at a conclusion opposite to that reached
> by this Court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable
> facts.  Under the "unreasonable application" clause, a federal habeas
> court may grant the writ if the state court identifies the correct
> governing legal principle from this Court's decisions but unreasonably
> applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2002).  *See also Lorraine v. Coyle*, 291 F.3d 416, 421-422 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003).

A state court decision is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams*, 529 U.S. at 405.  *See also Price v. Vincent*, 538 U.S. 634, 640 (2003).

A state court decision is not unreasonable simply because the federal court considers the state decision to be erroneous or incorrect.  Rather, the federal court must determine that the state court decision is an objectively unreasonable application of federal law.  *Williams*, 529 U.S. at 410-12; *Lorraine*, 291 F.3d at 422.

Lollis has filed his petition pro se.  The pleadings of a petition drafted by a pro se litigant are held to less stringent standards than formal pleadings drafted by lawyers, and will be liberally construed.  *Urbina v. Thoms*, 270 F.3d 292, 295 (6th Cir. 2001) (citing *Cruz v. Beto*, 405 U.S. 319 (1972); *Haines v. Kerner*, 404 U.S. 519 (1972) (per curiam)).  Other than that, no special treatment is afforded litigants who decide to proceed pro se.  *McNeil v. United States*, 508 U.S. 106, 113 (1993) (strict adherence to procedural requirements); *Jourdan v. Jabe*, 951 F.2d 108 (6th Cir. 1991); *Brock v. Hendershott*, 840 F.2d 339, 343 (6th Cir. 1988).

## IV.  PROCEDURAL DEFAULT

Respondent contends that both grounds of the petition are procedurally defaulted.  (Doc. 5 at 15-21.)

A habeas claim may be procedurally defaulted in two distinct ways. First, by failing to comply with state procedural rules. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)). Second, by failing to raise a claim in state court, and to pursue the claim through the state's ordinary review process. *Williams*, 460 F.3d at 806 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)).

When a petitioner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

A habeas petitioner cannot obtain relief unless he has completely exhausted his available state remedies. *Coleman,* 501 U.S. at 731; *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (citing *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir.), *cert. denied*, 534 U.S. 977 (2001)). To satisfy the exhaustion requirement, a habeas petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. The exhaustion requirement is satisfied when the highest court in the state has been given a full and fair opportunity to rule on the petitioner's claims. *Rust v. Zent*, 17 F.3d 155,

160 (6th Cir. 1994) (citing *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990)).

Where the petitioner failed to present a claim in state court, a habeas court may

deem that claim procedurally defaulted because the Ohio state courts would no

longer entertain the claim. *Adams v. Bradshaw*, 484 F. Supp. 2d 753, 769 (N.D.

Ohio 2007) (citing *Buell*, 274 F.3d at 349).

## A.      Ground One:  *Sufficiency of the Evidence*

In his first ground for relief, Lollis claims that his convictions were not

supported by sufficient evidence.  (Doc. 1 at 4.)  Respondent argues that Lollis

procedurally defaulted this claim by failing to timely appeal the claim to the Ohio

Supreme Court.  The Court agrees.

Lollis raised this claim on direct appeal to the state appellate court.  (Doc. 5-1

at 68-71.)  The court denied Lollis' appeal on February 26, 2014.  *Lollis*, 2014 WL

787224, at **1-7.  He had 45 days to appeal that decision to Ohio's high court.  *See*

Ohio S. Ct. Prac. R. 7.01(A)(1)(a).  He did not.  Instead, he filed a notice of appeal

and motion for leave to file a delayed appeal with the Ohio Supreme Court nearly

ten months later, on December 17, 2014.  (Doc. 5-1, Exs. 16, 17.)  The court

summarily denied his motion.  (Doc. 5-1, Ex. 18.)

The Sixth Circuit has held that where a petitioner fails to file a timely notice

of appeal with the Ohio Supreme Court and that court denies his motion for leave to

file a delayed appeal, a habeas court can assume that the motion was denied

because the petitioner failed to demonstrate adequate reasons for his failure to file

a timely notice of appeal or to otherwise comply with the court's requirements for delayed appeals. *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004) (per curium). An unexplained judgment of the Ohio Supreme Court denying a motion for delayed appeal, therefore, is an "adequate and independent" state procedural ruling upon which to bar federal habeas review. *Id.* As the Ohio Supreme Court summarily denied Lollis' motion for leave for leave to file a delayed appeal, this claim is procedurally defaulted and habeas review of the claim is barred.

Lollis contends, however, that this procedural bar should be excused. He argues that the "cause" of his failure to file a timely appeal was the appellate court and his appellate counsel's failure to inform him of the court's decision denying his appeal. He only learned of the decision in July or August of 2014, he claims, and did not obtain a file-stamped copy of it until November 2014, both with his family's assistance. (Doc. 7 at 3-5; Doc. 5-1 at 136.) He also attributes the delay to being placed in "23 hour per day lockdown with no access to legal services or materials." (Doc. 5-1 at 136.) Lollis further asserts that he can show "prejudice" and "actual innocence" to excuse his default for the same reasons that support his sufficiency claim. (Doc. 7 at 5-6.) Respondent counters that none of these arguments has merit. (Doc. 5 at 17-18.)

As to Lollis' contention regarding his appellate counsel, Respondent correctly points out that the ineffective assistance of appellate counsel cannot serve as "cause" for the procedural default of another claim if that claim, too, is procedurally

14

defaulted.  *See Edwards v. Carpenter*, 529 U.S. 446, 453-54 (2000).  Lollis never raised an appellate counsel ineffective-assistance claim in state court through Ohio's mechanism to do so, an application for reopening his direct appeal pursuant to Appellate Procedure Rule 26(B).  And the Sixth Circuit has held that "failure to meet Rule 26(B)'s ninety-day [deadline for filing such applications] bars [a habeas petitioner] from using his appellate attorney's alleged ineffectiveness as the necessary cause to overcome his procedural default."  *Abshear v. Moore*, 354 Fed. Appx. 964, 971 (6th Cir. 2009).  The court explained:

> Of course, this bar could itself be overcome if Abshear were to show some additional cause and prejudice with regard to Rule 26(B)'s time limit. . . .  However, we do not think there is adequate cause in this case. Abshear cannot again rely upon ineffective assistance of counsel or lack of counsel because Rule 26(B) proceedings are considered collateral, meaning Abshear had no Sixth Amendment right to an attorney. . . .  And to the degree that Abshear is relying upon his own lack of resources or lack of access to legal research materials, we have in the past found similar impediments to be inadequate to establish cause.

*Id.* (internal citations omitted).  Lollis, therefore, cannot excuse the procedural default of his sufficiency claim based on his appellate counsel's conduct.

Lollis attempts to circumvent this problem by characterizing his argument regarding his appellate counsel's failure to notify him of the appellate court's decision as one of "lack of notice" rather than ineffective assistance.  (Doc. 7 at 4.) But there is no authority for this proposition, and it lacks merit.

Lollis' reliance on the failure of the appellate court to provide him notice of its decision as "cause" for his procedural default similarly fails.  Under Ohio appellate

15

procedure rules, the court's service of a judgment "on a party represented by counsel shall be made on counsel."  Ohio App. P. R. 30(A).  Thus, the state appellate court had no obligation to notify Lollis personally of its judgment, and any alleged failure of the court to do so cannot constitute cause for procedural default.

Lollis' placement in "lock down" also cannot serve as cause for procedurally defaulting his sufficiency claim.  It is well-established that in order to establish cause, a habeas petitioner must show that "some objective factor external to the defense" prevented the petitioner's compliance with a state procedural rule.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Thus, a petitioner's pro se status before a state court, ignorance of the law, and lack of time in the prison law library all have been found insufficient to establish cause to excuse procedural default.  *Bonilla*, 317 F.3d at 498.  Here, too, the circumstances of Lollis' confinement do not excuse his failure to file a timely appeal to the Ohio Supreme Court.

Finally, the Court rejects Lollis' claims of "prejudice" and "actual innocence" to excuse his default.  The Court need not consider the "prejudice" prong of the procedural default analysis, as Lollis has not established "cause."  *See, e.g., Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).  To satisfy the "narrow exception" to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense, a petitioner must show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner [guilty]

16

under the applicable state law.'" *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).  Lollis cannot meet this high standard.

> Lollis claims that the State's case
>
> rests entirely upon stacked inferences; requiring the jury to first infer that Petitioner knew that the victim was to be robbed, and then requiring a stacked inference that the text message solely relied upon to prove the case, "Wat up he on his way to kelly tare em up just hit me up wen u done" . . . was proof positive that Petitioner knew that the perpetrator was going to rob and kill the victim.

(Doc. 7 at 6.)  As Lollis acknowledges, however, a court may sustain a conviction based upon nothing more than circumstantial evidence.  *See, e.g., United States v. Kelley*, 461 F.3d 817, 825 (6th Cir. 2006) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt."); *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994) (same).  Indeed, the Supreme Court has explained that circumstantial evidence is "intrinsically no different from testimonial evidence," and that both "may in some cases point to a wholly incorrect result."  *Holland v. United States*, 348 U.S. 121, 140 (1954).  "Yet . . . [i]n both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference."  *Id.* at 137-38.  To accomplish this, "the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."  *Id.* at 138.

17

In finding Lollis' aggravated murder conviction was supported by sufficient evidence, the state appellate court reasoned:

> {¶ 21} In his sufficiency challenge, Mr. Lollis first maintains that the State failed to produce proof of Mr. Lollis' purpose to cause Mr. Suleiman's death, a required element of the aggravated murder charge. . . .  However, "[a] jury can infer an aider and abettor's purpose to kill where the facts show that the participants in a felony entered into a common design and either the aider or abettor knew that an inherently dangerous instrumentality was to be employed to accomplish the felony or the felony and the manner of its accomplishment would be reasonably likely to produce death." . . .

> {¶ 22} Here, we conclude that the text messages provide sufficient evidence of a common plan between Mr. Lollis and Mr. Hunter to violently rob Mr. Suleiman. The evidence was also sufficient for the jury reasonably to infer the Mr. Lollis had knowledge that Mr. Hunter would be using a weapon or engaging in violence of a type reasonably likely to produce death, as he instructed Mr. Hunter to "tare em up[.]" Accordingly, . . ., there was sufficient evidence to sustain the aggravated murder conviction.

*Id.* at *6.

The Court agrees with the state court's conclusion.  The State presented far more evidence supporting its theory that Lollis was an accomplice in the aggravated robbery and murder than just the "tare em up" text as Lollis suggests.  The prosecution established that the police detectives recovered the victim's and Hunter's cell phones at the scene of the crime.  *Lollis*, 2014 WL787224, at *3.  The cell phones contained a series of text messages between the victim and a person the victim identified as "Young Homie," who signed his texts "$tackOr$tarve," and between Hunter and a person identified as "Bezz," who had the same phone number as "Young Homie."  *Id.* at *4.  The texts showed that "Young Homie" or "Bezz" was

18

arranging to meet the victim at Kelley's Carryout, while at the same time directing Hunter to meet the victim at Kelley's and "tare him up." *Id.* Tasha Thomas, a friend of Lollis', testified that Lollis told her about "a robbery gone bad" of "[s]ome Arab" at Kelly's that he had arranged. *Id.* at *5. She testified that Lollis' nickname was "Bezel" and he signed his texts "[s]tack and starve." *Id.* She gave the police Lollis' cell phone number, which a detective testified matched the number of "Young Homie" and "Bezz." *Id.* She also provided police with Lollis' driver's license, which she claimed he had left at her house. *Id.* Other testimony showed that during phone calls Lollis made in prison, Lollis tried to persuade individuals to testify that he was not known by the nickname "Bezel," but he responded to that name and even referred to himself by that name during the calls. *Id.* Lollis also tried to intimidate Ms. Thomas and influence other potential State witnesses while in prison. *Id.* at **5-6.

Thus, the evidence against Lollis was substantial. Lollis has not demonstrated that he is "actually innocent" of his crimes, or "by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found [him]" guilty of his crimes. *Dretke*, 541 U.S. at 392. Accordingly, Lollis' sufficiency-of-the-evidence claim is procedurally defaulted.[2]

---

[2] Even if Lollis' sufficiency claim were not procedurally barred from review, it would fail. Under *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979), a habeas court in reviewing a sufficiency claim must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

**B.**   **Ground Two:**  *Trial-Court Error / Jury Instruction*

Lollis' second ground for relief challenges the trial court's jury instruction on "conspiracy." (Doc. 1 at 6.) He claims that the trial court erroneously instructed the jury on "conspiracy," for which he was not charged, and failed to instruct the jury on "complicity," for which he was charged, as an accessory to the aggravated murder and robbery offenses. (Doc. 7 at 10.) Respondent contends that this claim also is procedurally defaulted. (Doc. 5 at 19-21.)

Respondent first argues that Lollis failed to fairly present this claim to state courts. (Doc. 7 at 19-20.) A federal habeas claim is fully exhausted if the petitioner gave state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). To provide state courts the necessary "opportunity," petitioners must "fairly present" federal constitutional claims "in each appropriate state court" before seeking relief in the federal courts. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). In determining whether a petitioner has fairly presented a federal claim to state courts, courts examine the petitioner's:

---

*Id.* at 319 (emphasis in original). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). For the same reasons Lollis was unable to demonstrate "actual innocence," he cannot show that no rational trier would have convicted him given the evidence adduced at trial.

> (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleg[ations of] facts well within the mainstream of constitutional law.

*Burt*, 395 F.3d at 613 (quoting *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).  "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  *Baldwin,* 541 U.S. at 32.

Lollis raised this jury-instruction claim in the state appellate court as his first assignment of error.  (*See* Doc. 5-1, Ex. 13 at 66-68.)  But he did not cite in his appellate brief any federal constitutional law, or any case, state or federal, that might have alerted the court to the alleged federal nature of the claim.  Nor did he employ any language that might have indicated the assertion of a federal constitutional claim.

Moreover, as discussed above, Lollis did not appeal the court of appeals' decision to the Ohio Supreme Court.  Accordingly, Lollis failed to fairly present this claim in state court, and it is procedurally defaulted on that ground.

Respondent further argues that Lollis procedurally defaulted this claim by failing to object to the complained-of jury instruction at trial.  (Doc. 5 at 19-20.) Lollis concedes that he did not object to the instruction.  (Doc. 7 at 10.)  The state appellate court, the last court to address the claim, asserted the failure to object as

21

a procedural bar to reviewing this claim.  The court noted that Lollis objected to the challenged jury instruction "on the basis that there was no evidence that he knew that Mr. Hunter would be armed with a deadly weapon.  [Yet] [a]fter the court indicated that it removed the reference to a weapon, Mr. Lollis raised no other objection to the instruction."  *Lollis*, 2014 WL787224, at *10.  The court continued,

> This Court has held:
>
>> A fundamental rule of appellate review is that a reviewing court will not consider as error any issue that a party was aware of but failed to bring to the trial court's attention.
>
> (Internal citations omitted.) . . .  Mr. Lollis did not object to the instruction's references to conspiracy, and he has not made a plain error argument on appeal, nor has he provided a reason why this Court should address this issue for the first time on appeal. . . .

*Id.* (internal citations omitted).

Ohio's contemporaneous objection rule requires that a party preserve an error for appeal by calling it to the attention of the trial court at a time when the error could have been avoided or corrected.  *State v. Glaros*, 170 Ohio St. 471 (Ohio 1960), paragraph one of the syllabus; *State v. Mason*, 82 Ohio St. 3d 144, 162 (Ohio 1998).  Failure to adhere to this "firmly-established" rule is "an independent and adequate state ground" upon which to find federal habeas claims procedurally defaulted.  *See, e.g., Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).  Lollis procedurally defaulted this claim on this ground as well.

22

Lollis repeats the arguments discussed above to demonstrate "cause" and "prejudice" and "actual innocence" to excuse the claim's procedural default.  The Court rejects those arguments.  This claim is procedurally defaulted.[3]

---

[3]  Even if Lollis' jury-instruction claim were not procedurally defaulted, it too would fail.  Respondent argues that this claim is not cognizable on federal habeas review because it is based on an error of state law.  (Doc. No. 5 at 22.)  The Court agrees.  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241).  *See also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law.");  *Engle v. Isaac,* 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process." (citation omitted)).  Thus, errors in jury instructions generally do not rise to the level of federal constitutional violations.  Indeed, "the circumstances that would induce a federal court to overturn the state court determination" regarding a requested jury instruction "would need to be extraordinary."  *Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir. 1990).  Federal habeas courts must determine "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'"  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Lollis has not shown any such extraordinary circumstances here.  As the state appellate court observed, the challenged "conspiracy" instruction was located within a larger instruction that fully explained "complicity."  *Lollis*, 2014 WL787224, at *9.

## V.  RECOMMENDATION

Lollis' petition for a writ of habeas corpus (Doc. 1) should be denied.


Dated:  __Apr. 26, 2016__          __/s/ Kenneth S. McHargh__
                                    Kenneth S. McHargh
                                    United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).